3 P.3d 1172

In the Matter of the ESTATE OF John R. FOGLEMAN, Deceased.

Snell & Wilmer L.L.P.; Richard W. Sheffield, individually and as former Personal Representative of the Estate of John R. Fogleman, Deceased; and Roger Curley and Kevin J. Parker, individually and as attorneys for the former Personal Representative, Petitioners–Appellants, Cross Appellees,

v.

Karen J. (Hurd) Fegen, Personal Representative, and as conservator for Katie Marie Fogleman, minor child of the Decedent, Respondent–Appellee, Cross Appellant,

Pilar Rivero, Appellee.

No. 1 CA–CV 98–0610.

Court of Appeals of Arizona, Division 1, Department A.

March 2, 2000.

Fennemore Craig by Kenneth J. Sherk and Timothy J. Burke, Phoenix, for Petitioners–Appellants Snell & Wilmer L.L.P., Richard W. Sheffield, and Kevin J. Parker.

Bryan Cave by Mark I. Harrison, Phoenix, for Petitioner–Appellant Roger D. Curley.

Sacks Tierney P.A. by Randall S. Yavitz, James W. Armstrong, Candess J. Hunter, Phoenix, for Respondent–Appellee Karen J. (Hurd) Fegen.

John R. Coll, Ronald G. Cooley, Phoenix, for Respondent–Appellee Pilar Rivero.

## OPINION

BERCH, Judge.

¶ 1 Appellants ask that we review the trial court's determination that they breached their fiduciary duty, violated Ethical Rules 1.7 and 2.2, and committed bad faith in connection with their handling of the Fogelman Estate. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

¶2 John Fogelman ("Decedent") died on March 10, 1997, leaving behind a will naming several beneficiaries. In addition to the assets disposed of in the will, Decedent owned a $1.5 million life insurance policy. The beneficiaries of the life insurance policy were Decedent's mother, Lu Fogelman; his four children: David, Mandy, Marcy, and Katie–Marie Fogelman; Sharon Peters; Appellee Pilar Rivero; and four creditors: Jerry Middleman, Bank of America, Citibank, and Appellee Karen Fegen,[1] a former wife.[2] Decedent's will directed the personal representative to pay from the residuary estate any inheritance and estate taxes imposed with respect to property passing both under and outside the will. In a separate provision, the will also instructed the personal representative not to seek reimbursement from beneficiaries of the life insurance for the taxes generated by the life insurance policy.

¶3 Upon Decedent's death, pursuant to the terms of the will, Appellant Richard Sheffield was appointed personal representative of the estate. Sheffield was and still is a partner in the Snell & Wilmer law firm, an appellant in this case. Sheffield hired Appellant Roger Curley, then a Snell & Wilmer attorney, to represent him in his capacity as personal representative.

¶4 While settling Decedent's affairs, Sheffield determined that, after paying the estate's creditors, the residuary estate did not contain sufficient assets to honor Decedent's request to pay the taxes generated by the insurance policy. In fact, the estate was insolvent and the assets were insufficient to pay all of the estate debts. Accordingly, Sheffield attempted to apportion the taxes among the insurance beneficiaries. Although all of the life insurance beneficiaries initially agreed to have a portion of the insurance benefits "held back" to pay the taxes, they

later withdrew their consent. In June 1997, they asked Sheffield to resign his position as personal representative because of the dispute over the payment of taxes.

¶5 After trying for four more months to resolve matters, Sheffield filed a petition for instructions with the probate court seeking guidance on the tax-payment issue. In an order dated December 2, 1997, the court concluded that the provisions of the will implemented 26 U.S.C. § 2206 (1994), which requires collection of estate taxes from insurance beneficiaries "[u]nless the decedent directs otherwise in his will." Because Decedent's will did contain a tax-shifting provision, the court ordered that Sheffield "not seek contribution for the taxes from the life insurance beneficiaries" and that he pay the claims against the estate, including the taxes generated by the insurance policy, pursuant to the priority of claims statute, Arizona Revised Statutes Annotated ("A.R.S.") section 14–3805 (1995).

¶6 The court further ordered Sheffield to file a petition for approval of his fees and his attorneys' fees. The insurance beneficiaries objected to the fees requested, claiming that Sheffield's hourly rate of $220 was excessive for his work as personal representative and that Sheffield and Snell & Wilmer had a conflict of interest because they failed to disclose that Snell & Wilmer represents many of the estate's creditors. No one disputed that the claims of the creditors were valid, however. The insurance beneficiaries also requested that the court remove Sheffield as personal representative for failing to "defend and uphold" the will and failing to disclose the conflict of interest.

¶7 The court found that Sheffield and Snell & Wilmer had a conflict of interest and that they violated Ethical Rules 1.7 and 2.2 and A.R.S. section 14–3703(A) (Supp.1998–1999),[3] which imposes a fiduciary duty upon a personal representative and the personal

---

1. Ms. Fegen's name is spelled variously throughout the record as Kerryn or Karen, Fegan or Fegen. We use the spelling employed in the Court's caption.

2. Although all of these individuals and entities benefitted from the insurance proceeds, we shall use the term "the insurance beneficiaries" in this

opinion to mean all insurance beneficiaries except Middleman, Citibank, and Bank of America, unless otherwise specifically noted.

3. The final judgment refers to A.R.S. section 14–3702(A); however, the court clearly intended to cite A.R.S. section 14–3703(A).

representative's attorneys. The court removed Sheffield as personal representative and appointed Appellee Fegen to replace him. The court also disqualified Snell & Wilmer from further participation in the case. On the issue of fees, the court found that Sheffield and Snell & Wilmer generated a large percentage of their fees by taking "positions adverse to the interests of the successors ... to minimize the amount of money paid from the estate for taxes so that money could be paid to [the] firm's other clients." The court also found that Sheffield and Snell & Wilmer acted in bad faith by failing to disclose their conflict of interest. For these reasons, it reduced their fees from $110,000 to approximately $22,500. Appellants moved for a new trial on the ethical violations and bad faith determinations, but the court denied the motion.

## ISSUES

■ ¶ 8 Appellants raise three issues on appeal: (1) Did the trial court err in finding

4. The trial court made the bad faith, breach of fiduciary duty, and violation of Ethical Rules findings in ruling on the petition to remove Sheffield as the personal representative and on the objection to Appellants' fees. Appellants do not appeal either of these rulings. They appeal only the determinations that supported those rulings. We are bound by the trial court's findings of fact unless they are clearly erroneous, but review questions of law de novo. *See Combs v. DuBois*, 135 Ariz. 465, 468, 662 P.2d 140, 143 (App. 1982).

5. "Successors" are "persons, other than creditors, who are entitled to property of a decedent under a will or this title." A.R.S. § 14–1201(51) (1995).

6. Ethical Rule 1.7 provides as follows:
 (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
 (1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
 (2) each client consents after consultation.
 (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or. to a third person, or by the lawyer's own interests, unless:
 (1) the lawyer reasonably believes the representation will not be adversely affected; and
 (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall

that Appellants violated Ethical Rules 1.7 and 2.2; (2) did the trial court err in finding that Appellants violated their fiduciary duty imposed by A.R.S. section 14–3703(A); and (3) did the trial court err in finding that Appellants acted in bad faith? [4]

## DISCUSSION

### I. *Ethical Violations*

■ ¶ 9 The trial court found that Sheffield and Snell & Wilmer violated Ethical Rules 1.7 and 2.2 because the interests of the unsecured creditors, some of whom were Snell & Wilmer clients, were adverse to the interests of the insurance beneficiaries, some of whom were successors [5] to the estate. Ethical Rule 1.7 explains an attorney's duty to a *client* in a conflict of interest situation.[6] 17 A.R.S. R. Sup.Ct., Rules of Professional Conduct, Rule 42 ("Ethical Rules"). Ethical Rule 2.2 provides guidance for those situations in which a lawyer serves as an intermediary between *clients*.[7] Although, the trial

include explanation of the implications of the common representation and the advantages and risks involved.

7. Ethical Rule 2.2 provides as follows:
 (a) A lawyer may act as intermediary between two clients if:
 (1) the lawyer consults with each client concerning the implications of the common representation, including the advantages and risks involved, and the effect on the attorney-client privileges, and obtains each client's consent to the common representation;
 (2) the lawyer reasonably believes that the matter can be resolved on terms compatible with the clients' best interests, that each client will be able to make adequately informed decisions in the matter and that there is little risk of material prejudice to the interests of any of the clients if the contemplated resolution is unsuccessful; and
 (3) the lawyer reasonably believes that the common representation can be undertaken impartially and without improper effect on other responsibilities the lawyer has to any of the clients.
 (b) While acting as an intermediary, the lawyer shall consult with each client concerning the decisions to be made and the considerations relevant in making them, so that each client can make adequately informed decisions.
 (c) A lawyer shall withdraw as intermediary if any of the clients so requests, or if any of the conditions stated in paragraph (a) is no longer satisfied. Upon withdrawal, the lawyer shall not continue to represent any of the clients in the matter that was the subject of the intermediation.

court made no specific finding and offered no legal support for its suggestion that the successors to the estate were clients of the personal representative or the personal representative's attorneys, the trial court clearly considered them to be clients of Sheffield and the attorneys who were representing him. On appeal, Appellee Rivero implicitly concedes that no attorney-client relationship exists between a personal representative and a successor to an estate, while Appellee Fegen fails to address the issue.

¶ 10 In *In re Estate of Shano*, 177 Ariz. 550, 869 P.2d 1203 (App.1993), we addressed, albeit indirectly, whether beneficiaries of an estate are the personal representative's clients. There we held that a personal representative owes a duty of fairness and impartiality to all beneficiaries. *See id.* at 556, 869 P.2d at 1209. We noted, however, that an attorney owes a client "a duty of undeviating and single allegiance." *Id.* (citing *Parsons v. Continental Nat'l Am. Group*, 113 Ariz. 223, 227, 550 P.2d 94, 98 (1976) (discussing duty of insured's attorney who is compensated by insurer)). That a personal representative owes a beneficiary the lesser duty of fairness, rather than the duty of undivided loyalty, demonstrates that the beneficiary is not the personal representative's client.

■ ¶ 11 By holding that the personal representative's attorney also owed the beneficiary the lesser duty of fairness and impartiality, we implied that the beneficiary similarly was not a client of the personal representative's attorney. *See id.* at 558, 869 P.2d at 1211. We believe the *Shano* court's analysis is correct and we follow it here. Thus, the successors to the estate were not the personal representative's or the personal representative's lawyers' *clients* to whom a duty of undivided loyalty was owed.

¶ 12 Any other interpretation would create conflicts among a personal representative's statutory duties. By statute, a personal representative owes a fiduciary duty of fairness and impartiality to all "interested persons,"

*see* A.R.S. § 14–3712 (1995); *Shano*, 177 Ariz. at 555, 869 P.2d at 1208, a term that includes "any heir, devisee, child, spouse, creditor, [or] beneficiary...." *See* A.R.S. § 14–1201(26) (1995). Thus, if the successors [8] to an estate—who are interested persons to whom a fiduciary duty is owed—are also "clients" of the personal representative to whom the personal representative owes a duty of undivided loyalty, then the personal representative would be unable in handling any estate to fulfill its fiduciary duty of fairness and impartiality to all interested parties; for in any estate, there are competing demands from beneficiaries, successors, and creditors. The personal representative would not be able to give undivided loyalty to some while at the same time being truly impartial and fair to others, for money or assets paid to one are unavailable to the others. The comment to Ethical Rule 1.7 recognizes the difficulty of this situation. *See* comment (Other conflict situations: "In estate administration the identity of the client may be unclear under the law of a particular jurisdiction. Under one view, the client is the fiduciary; under another view, the client is the estate or trust, including its beneficiaries."). Unfortunately, the comments provide no guidance for resolving the tension among the personal representative's roles. Other commentaries on Rule 1.7 caution personal representatives not to represent both a decedent's estate and a creditor with a claim against the estate. *See* American College of Trust and Estate Counsel, Commentaries on the Model Rules of Professional Conduct 154 (3d ed.1999).

¶ 13 Accordingly, because the successors were not clients of either Sheffield or Snell & Wilmer, we reverse the trial court's conclusion that Appellants violated Ethical Rules 1.7 and 2.2, which relate to a lawyer's or law firm's duty to a client.

## II. *Fiduciary Duty*

¶ 14 The trial court found that Appellants Sheffield and Snell & Wilmer breached the

---

8. Although a personal representative owes a duty to serve the "best interests" of successors to the estate, *see* A.R.S. § 14–3703(A), we have equated the duty to serve the best interests of the succes-

sors with the fiduciary duty of fairness and impartiality. *See Shano*, 177 Ariz. at 555, 869 P.2d at 1208; *see also* discussion *infra* at ¶ 17.

fiduciary duty to the successors to the estate imposed by A.R.S. section 14–3703(A), which requires that a personal representative "shall use the authority conferred upon him ... for the best interests of successors to the estate." Specifically, the court found that Appellants breached their duty to Decedent's children, who were both successors to the estate and insurance beneficiaries. The trial court held that Appellants owed a duty of undivided loyalty to these individuals as successors under the will.

¶ 15 On this issue, too, we find informative this Court's decision in *In re Estate of Shano*. There, the decedent executed a holographic will just days before his death. An earlier will named the decedent's wife, Thelma, as a beneficiary. *See* 177 Ariz. at 553, 869 P.2d at 1206. The holographic will did not include Thelma, but included a woman named Garrison. *See id.* Garrison's attorney, Maksym, filed the holographic will with the court and the court named Garrison the special administrator for the estate. *See id.* When the wife, Thelma, disputed the validity of the holographic will, the court removed Garrison as the special administrator and appointed a neutral party, Fiduciary Services, Inc., in her place. *See id.* Six weeks after Fiduciary Services' appointment, Fiduciary Services filed a notice that Maksym would be representing the special administrator. *See id.* Thelma asserted several claims against the estate, all of which were opposed by Maksym and Fiduciary Services. *See id.* at 553–54, 869 P.2d at 1206–07. She ultimately sought to disqualify Maksym as Fiduciary Services' counsel because of a conflict of interest. *See id.* at 554, 869 P.2d at 1207. The trial court removed Maksym and we found no abuse of discretion in the trial court's actions. *See id.*

¶ 16 Similarly, in this case, we must determine whether Appellants breached their fiduciary duty under section 14–3703(A) by attempting to represent the interests of interested parties and successors while Snell & Wilmer represented the estate creditors as clients in other actions.

*Sheffield's duty as personal representative to successors and creditors*

¶ 17 Section 14–3703(A) requires that a personal representative "shall use the

authority conferred upon him ... for the best interests of the successors of the estate." In *Shano*, the Court implied that the duty to serve the best interests of successors is equivalent to the duty of fairness and impartiality. 177 Ariz. at 555, 869 P.2d at 1208. That analysis provides a correct and workable standard. Statutes must be read together so that they operate in harmony with one another. *See Lavidas v. Smith*, 195 Ariz. 250, 252, 987 P.2d 212, 214 (App.1999). If section 14–3703, which imposes the duty to serve the best interests of successors, creates a higher duty than the duty of fairness and impartiality, then it would conflict with section 14–3712, which imposes a duty of fairness and impartiality to all interested persons. Because the list of individuals who are interested persons includes successors but is far broader than only successors, *see* A.R.S. § 14–1201(26) & (51), a personal representative could not fulfill a higher duty to successors without simultaneously breaching the duty of fairness and impartiality to the other interested parties. Accordingly, the duty owed to successors can be no greater than that owed to all interested parties. Thus, as personal representative, Sheffield owed both the successors to the estate and the creditors a duty of fairness and impartiality.

*Snell & Wilmer's duties to the successors and client-creditors*

¶ 18 As Sheffield's attorneys, Snell & Wilmer owed a derivative fiduciary duty to the successors of the estate, Decedent's children. *See Shano*, 177 Ariz. at 555, 869 P.2d at 1208 (holding that "where the surviving spouse is concerned, similar considerations apply to an attorney employed to represent the personal representative of an estate"). But they owed some of the creditors, Snell & Wilmer's clients, a higher and conflicting duty of single allegiance.

*Sheffield's duty to client-creditors*

¶ 19 As a partner in the Snell & Wilmer law firm, Sheffield also owed the creditor-clients a duty of undivided loyalty. Ethical Rule 1.10 imputes disqualification

from representation upon members of a law firm. It prohibits an attorney in a firm from representing a client if the attorney would have been prohibited from representing that client as a solo practitioner. *See* Ethical Rule 1.10(a). The comment to the rule explains "that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated." *See also In re Murphy*, 188 Ariz. 375, 379, 936 P.2d 1269, 1273 (1997) (rejecting attorney's claim that there was no attorney-client relationship between himself and his firm's client merely because he did not personally represent the client). That some partners of a firm may not know clients of others in the firm provides no defense. Any time a law firm undertakes representation of a client, it has an obligation to do a conflicts check to ensure that no conflict exist between clients.

¶ 20 Thus, Sheffield and his attorneys could not have fulfilled their duty to the creditors without compromising the duty to the successors, for any monies paid to creditors of the insolvent estate were rendered unavailable to the beneficiaries. *See Shano*, 177 Ariz. at 556, 869 P.2d at 1209. If they fulfilled their duty of undivided loyalty to the creditor-clients, Appellants could not have been fair and impartial toward the successors; and if they were truly fair and impartial toward the successors, they could not have fulfilled their duty of single and undeviating allegiance to the creditor-clients.

¶ 21 Appellants argued that their duty to the beneficiaries did not conflict with any duty owed the creditor-clients because Appellants were not actively representing the creditor-clients in the probate matter. *See id.* at 557, 869 P.2d at 1210 (rejecting the argument that no duty is owed once the attorney-client relationship is terminated). However, attorneys continue to owe current clients a duty of loyalty even if they are not acting as the clients' attorneys in the precise transaction at issue. *See id.; see also In re Spear*, 160 Ariz. 545, 552, 774 P.2d 1335, 1342 (1989). The Ethical Rules expressly protect the interests of current clients. *See* Ethical Rule 1.7 cmt. ("Ordinarily, a lawyer may not act as advocate against a client the lawyer represents in some other matter, even if the

other matter is wholly unrelated."); *see also In re Weiner*, 120 Ariz. 349, 352, 586 P.2d 194, 197 (1978) (discussing Ethical Rule 1.8(a)(1), noting that lawyer must fully disclose all conflicts inherent in business transaction involving lawyer and client).

¶ 22 To decide whether Appellants breached their fiduciary duty to the estate beneficiaries, we need not determine whether they violated the Rules of Professional Conduct. The Ethical Rules do, however, provide guidance in determining whether a fiduciary has breached its duty when that fiduciary is also an attorney. *See Shano*, 177 Ariz. at 556–57, 869 P.2d at 1209–10; *see also In re Lurie*, 113 Ariz. 95, 97–98, 546 P.2d 1126, 1128–29 (1976) (no matter the capacity in which attorneys act, they are held to the high standard of professional conduct expected of all attorneys). The Ethical Rules also help determine how the attorney-fiduciary should resolve ethical questions. *See Shano*, 177 Ariz. at 556–57, 869 P.2d at 1209–10. In a conflict situation, Ethical Rule 1.7(b) states that

> (b) A lawyer shall not represent a client *if the representation of that client may be materially limited by the attorney's responsibility to another client or to a third person*, or by the lawyer's own interests, unless:
>> (1) the lawyer reasonably believes the representation will not be adversely affected; and
>> (2) the client consents after consultation. . . .

(Emphasis added.) Here, the interests of the creditors and the interests of the successor children were adverse: Any money paid as taxes on the insurance proceeds was unavailable to pay estate creditors. In addition, Appellants owed the creditors and the beneficiaries competing duties. However, Appellants never advised the beneficiaries that some of the creditors of the estate were current Snell & Wilmer clients.

¶ 23 Although Appellants may not have had an attorney-client relationship with the beneficiary-successors, they nonetheless were required, as attorney-fiduciaries, to disclose the conflict between their

duty to the beneficiaries and their duty to the creditors. *See Shano*, 177 Ariz. at 557, 869 P.2d at 1210 (holding that Maksym should have consulted with Thelma regarding the conflict of interest and obtained her consent).[9] This holding makes clear that all attorneys involved in probate matters have a duty to check for possible conflicts before representing a personal representative or administering an estate.

■ ¶ 24 Although the trial court erroneously held that Appellants owed a duty of loyalty to the successors of the estate, the trial court did not err in finding that Appellants breached the fiduciary duties of fairness and impartiality to the successors imposed by A.R.S. section 14–3703. We may affirm a trial court if it reaches the right result, even if for the wrong reason. *See Gary Outdoor Adver. Co. v. Sun Lodge, Inc.*, 133 Ariz. 240, 242, 650 P.2d 1222, 1224 (1982). Thus, we affirm the trial court's conclusion that Appellants breached their fiduciary duty.

III. *Bad Faith*

¶ 25 The trial court found that Appellants acted in bad faith by failing to disclose that some of the creditors were also Snell & Wilmer clients and by failing to withdraw when the conflict became apparent. The court found bad faith based on the conflict of interest and also, in part, on its erroneous belief that Appellants represented the successors as clients and, therefore, owed them a duty of undivided loyalty. The court also appears to have based its finding of bad faith on the incorrect belief that Appellants were advocating a legally unsound position with respect to the payment of the taxes solely in order to improperly elevate the claims of the unsecured creditors above the payment of

the gift of taxes generated by the life insurance policy. In its judgment dated May 22, 1998, the court found that

> [t]he fees escalated due to the Personal Representative's desire to maximize payment of taxes from the life insurance beneficiaries in an effort to obtain payment of unsecured claims of other clients in his firm.
>
> . . . .
>
> From the beginning, the Personal Representative has been attempting to minimize the amount of money paid from the estate for taxes so that money could be paid to his firm's other clients with all these efforts paid for not by Snell & Wilmer's unsecured creditor clients, but from estate assets. [Footnote omitted.]
>
> . . . .
>
> . . . [T]he Personal Representative did act in bad faith [in part] because of [his] . . . utilization of estate assets to represent his firm's creditor clients at the expense [of] and to the detriment of the successors. . . .

¶ 26 Thus, before addressing the issue of bad faith, we must first determine whether the trial court erred in finding that the taxes generated by the insurance policy should be paid from the estate, before claims of creditors were paid. The trial judge's belief that Appellants were advocating an unreasonable position clearly influenced his findings of bad faith.[10] In order to determine whether the trial court was correct, we must examine the validity of the underlying assumptions.

A. *Responsibility for Payment of Taxes*

■ ¶ 27 Generally, taxes on the proceeds of a life insurance policy are the responsibility of the insurance beneficiary:

> Unless the decedent directs otherwise in his will, if any part of the gross estate on

9. The *Shano* court also noted, however, that disclosure and consent would probably not have remedied the situation given the conflicting interests involved in that case. 177 Ariz. at 555, 869 P.2d at 1208 (citing Ethical Rule 1.7(b)(1)). While we agree with this dicta in a litigation context, we recognize that an attorney may, after full disclosure and written consent, represent several parties with potentially conflicting interests in an estate in which the distribution of assets is not contested. *See* Ethical Rule 1.7(b).

To hold otherwise would create a great hardship on attorneys handling probate matters.

10. Sheffield initially appealed the court's ruling on this underlying issue. However, Fegen withdrew the appeal after the court removed Sheffield as personal representative and appointed Fegen in Sheffield's place. Nonetheless, we consider whether the court's decision on the issue affected its findings of ethical violations and bad faith.

which tax has been paid consists of proceeds of policies of insurance on the life of the decedent ..., the executor shall be entitled to recover from such beneficiary such portion of the total tax paid as the proceeds of such policies bear to the taxable estate....

26 U.S.C. § 2206. Here, Decedent did "direct otherwise." He instructed that the estate bear the burden of paying all taxes, including those generated by the life insurance policy. Decedent's will contained two clauses addressing the payment of taxes:

12.1 *Payment of Taxes.* Except as provided in the next sentence, *I direct that any inheritance, legacy, succession, unified transfer, or estate taxes,* as determined by compromise or otherwise (including interest and penalties thereon), *imposed by any domestic or foreign law* now or subsequently in force *with respect to all property passing under this Will or otherwise and whether such taxes are payable by my estate or by any recipient, shall be paid by my Personal Representative from my residuary estate without apportionment.* ...

12.2 *No Right of Reimbursement. My Personal Representative shall not seek reimbursement for taxes as provided in sections 2206 and 2207 of the Code.* The foregoing Code section reference and all references herein to the Code or a Code section are to the United States Internal Revenue Code of 1986, as amended from time to time, and shall be deemed to refer to corresponding provisions of subsequent federal tax laws.

(Emphasis added.) Clause 12.1 instructs the personal representative to pay from the residuary estate all taxes generated by property passing under the will "or otherwise," whether payable by the estate or a recipient. Thus, although the proceeds from the life insurance policy passed outside the will, the taxes generated by the life insurance policy were to be paid from the residuary estate.

¶ 28 Appellees argue that, because the estate is insolvent and there are insufficient funds available to satisfy debts, the estate taxes generated by the insurance proceeds should be paid pursuant to A.R.S. section 14-

3805(A), the priority of claims statute, which provides as follows:

A. If the applicable assets of the estate are insufficient to pay all claims in full, the personal representative shall make payment in the following order:

1. Costs and expenses of administration.

2. Reasonable funeral expenses.

3. Debts and taxes with preference under federal law.

4. Reasonable and necessary medical and hospital expenses of the last illness of the decedent, including compensation of persons attending him.

5. Debts and taxes with preference under the laws of this state.

6. All other claims.

Appellees claim that the payment of taxes on the insurance proceeds falls within subsection three of the statute—"Debts and taxes with preference under federal law," while claims of creditors fall within subsection six—"All other claims." They argue that the payment of taxes has higher priority than does the payment of creditors and that the taxes therefore must be paid before creditors are paid.

 ¶ 29 We disagree because the priority of claims statute does not provide for or apply to payment of estate taxes. The priority of claims statute is found in the chapter of the probate code that addresses "Creditors' Claims." Estate taxes are not creditor claims and so are expressly excluded from the statutory definition of "claims." *See* A.R.S. § 14-1201(6) (1995) ("claims" do not include "estate or inheritance taxes"). This definition comports with common sense. The priority of claims statute applies only to insolvent estates. *See* A.R.S. § 14-3805(A). Estate taxes are taxes on the right to transfer property as a result of death and are calculated on the net transfer of the wealth of the estate—the assets remaining after the payment of the claims listed in items 1–6 of the priority of claims statute. *See* 26 U.S.C. § 2001 (1994) (imposing tax on the right to transfer wealth at death); 26 U.S.C. § 2053(a) (1994) (listing deductions allowed in determining taxable estate); *see also*

Black's Law Dictionary 550 (6th ed.1990) (defining estate tax). So an insolvent estate would not normally incur estate taxes because it has no property to transfer or be taxed upon. *See* A.R.S. § 14–3901 (1995) ("[s]uccessors take subject to ... the claims of creditors").

¶ 30 Appellants, on the other hand, argue that because the residuary was insolvent, clause 12.1—requiring that the taxes be paid from the residuary—failed. We agree. Other jurisdictions have held that if a decedent directs the personal representative to pay, from the residuary, taxes that would normally be paid by the beneficiary,[11] but there is no residuary from which to pay the taxes, the direction of the will must fail. *See In re Estate of Nesbitt,* 158 Cal.App.2d 630, 323 P.2d 474, 476–77 (1958); *Smith v. Livermore,* 298 Mass. 223, 10 N.E.2d 117, 131 (1937); *see generally* Maurice T. Brunner, Annotation, *Construction and Effect of Will Provisions Expressly Relating to the Burden of Estate or Inheritance Taxes,* 69 A.L.R.3d 122, 452 (1976, Supp.1996); Annotation, *Construction and Effect of Provisions of Will Relied Upon as Affecting the Burden of Taxation,* 37 A.L.R.2d 7, 126–27 (1954); 42 Am. Jur.2d *Inheritance, Estate, and Gift Taxes* § 381 (1969). The courts have explained that the direction fails because it creates an additional legacy, specifically, a residuary legacy, which cannot be honored due to lack of funds. *See Nesbitt,* 323 P.2d at 476; *see generally* 37 A.L.R.2d at 128; 28 Am.Jur. *Inheritance, Estate, Succession, and Gift Taxes* § 522 (1959). In such cases, the taxes must be paid as required by law had the direction in the will never existed—generally, by the beneficiary. *See Nesbitt,* 323 P.2d at 477; *see generally* 69 A.L.R.3d at 452–53, 37 A.L.R.2d at 126; 42 Am.Jur.2d *Inheritance, Estate, and Gift Taxes* § 381.

¶ 31 In this case, estate taxes, which are the responsibility of the estate to pay,

have been generated by the insurance proceeds. *See* 22 U.S.C. § 2042 (1994) (including life insurance proceeds in the calculation of the gross estate); *YMCA,* 264 U.S. at 50, 44 S.Ct. 291; *see also* Black's Law Dictionary 550 (defining estate tax). Yet the proceeds of the policy are not available to pay Decedent's debts, so the estate remains insolvent and unable to pay the estate taxes. This dilemma is resolved by 26 U.S.C. § 2206, which directs that the beneficiaries of a life insurance policy pay the estate taxes generated by the policy. Because the burden of payment of the taxes generated by the life insurance proceeds ordinarily falls upon the beneficiaries and not the estate, the will provision requiring the estate to pay the taxes generated from the insurance proceeds should be treated as a bequest to the insurance beneficiaries of the amount of taxes on the insurance proceeds. Thus, clause 12.1 and the residuary gift fail because there is no residuary from which to pay the taxes.

¶ 32 Having determined that clause 12.1 fails, we must now address whether clause 12.2 assists the beneficiaries. Clause 12.2 of the will specifically prohibits seeking reimbursement of the taxes from the insurance beneficiaries. Clause 12.2 transforms the residuary legacy of clause 12.1—the gift of the amount of taxes on the insurance proceeds—into a preferred general legacy for the insurance beneficiaries. *See generally* 69 A.L.R.3d at 465–66. If the estate were not completely insolvent, other legacies would abate to pay the taxes generated by the life insurance policy and achieve Decedent's wishes. *See* 14–3902(B); Jeanette K. Geiser, et al., Arizona Probate Code Practice Manual § 5.13.2 (3d ed.1989 & rev.1997); *see also Bankers Trust Co. v. Hess,* 2 N.J.Super. 308, 63 A.2d 712, 714 (Ch.1949). But because the estate assets are insufficient to pay any of the legacies, there are no funds with which to pay this gift to the insurance beneficiaries,

---

**11.** Examples of taxes normally paid by the beneficiary include inheritance taxes, *see YMCA v. Davis,* 264 U.S. 47, 50, 44 S.Ct. 291, 68 L.Ed. 558 (1924), and estate taxes in states that have adopted apportionment statutes and apportion estate taxes among the beneficiaries. Arizona, however, has not adopted the apportionment section of the Uniform Probate Code. *See In re*

*Estate of Mason,* 190 Ariz. 312, 314, 947 P.2d 886, 888 (App.1997), *review denied* (Dec. 16, 1997). Therefore, in Arizona, unless a decedent directs otherwise, estate taxes are normally paid from the residuary. *See id.* (citing *Sanders v. Boyer,* 126 Ariz. 235, 240, 613 P.2d 1291, 1296 (App.1980)).

and clause 12.2 fails also. Accordingly, the insurance proceed taxes must be paid as directed by law, and the insurance beneficiaries are responsible for bearing the burden of taxes generated by the life insurance policy. *See* 26 U.S.C. § 2206.

¶ 33 Appellees claim that Arizona case law supports their position that if a will directs that a personal representative not seek tax reimbursement from an insurance beneficiary, the personal representative may not seek reimbursement even if the estate is insolvent. Moreover, they maintain that the insurance taxes must be paid before creditors to the estate are paid. Appellants cite *Brewer v. Peterson*, 9 Ariz.App. 455, 453 P.2d 966 (1969), for the proposition that the language of the will controls the distribution of assets, even if the estate is insolvent. In *Brewer*, the decedent gave $1.2 million in gifts to her nephew prior to her death. *Id.* at 456, 453 P.2d at 967. The Internal Revenue Service found that the gifts were made in contemplation of death and were therefore subject to estate taxes. *See id.* As a result, the estate taxes exceeded the value of the remaining assets of the estate. *See id.* The decision is unclear as to whether the assets referred to were the assets remaining before or after creditors were paid. However, because the court never refers to the estate as "insolvent" and estate taxes are generally calculated from the net estate after all debts are paid, we assume that the assets to which the court referred were the assets that remained for additional bequests after creditors' claims were satisfied. Thus, the issue in *Brewer* was whether the estate taxes should be apportioned among the beneficiaries in proportionate share. *Id.* The question we must decide is whether to enforce Appellees' interpretation of the will that the gift of taxes takes priority over the uncontested, legitimate debts of the estate. Unlike our case, the *Brewer* will instructed that the debts of the estate be paid first. *Id.* at 458, 453 P.2d at 969. Because the question in *Brewer* differed, we do not find *Brewer* helpful in our analysis.

¶ 34 Appellees also rely on *In re Estate of Tovrea*, 173 Ariz. 568, 845 P.2d 494 (App. 1992), for the proposition that a decedent who leaves an insolvent estate may reject the apportionment of death taxes in his will. We note, however, that the issue in *Tovrea* was whether a direction in a will to pay all estate and inheritance taxes from the residuary was sufficiently clear to require the estate to pay taxes generated by a life insurance policy. *Id.* at 571, 845 P.2d at 497. Here, the parties do not dispute the clarity of the direction in the will to pay taxes generated by the life insurance policy; rather, the issue is whether the direction fails for lack of money to pay those taxes. Furthermore, *Tovrea* is unclear as to whether the estate was insolvent. The opinion notes in passing that some of the parties alleged that the estate was insolvent but that other parties disputed the allegation. *See id.* at 570, 845 P.2d at 496. The decision does not refer to a finding that the estate was insolvent, and insolvency seems not to have been an issue in the decision.

¶ 35 Finally, Appellees cite *In re Trust of Hayes*, 129 Ariz. 174, 629 P.2d 1010 (App. 1981). However, like the earlier cases, *Hayes* does not mention whether the estate was solvent. Thus, it too provides no guidance on the issue before us.

¶ 36 As stated earlier, Appellees argued and the trial court held that the taxes generated by the insurance policy should be paid pursuant to the priority of claims statute, before legitimate debts owed to the estate's creditors. *See* A.R.S. § 14-3805. We conclude, however, that the trial court misinterpreted the priority of claims statute as including estate taxes, and therefore erred. Arizona law expressly excludes estate and inheritance taxes from the priority of claims statute. *See* A.R.S. § 14-1201(6) (claims do "not include estate or inheritance taxes").

¶ 37 Instead we conclude that the payment of taxes generated by the insurance proceeds was a testamentary gift from Decedent to the insurance beneficiaries. Decedent attempted to shift the burden of these taxes, which would not normally have fallen to the estate, from the insurance beneficiaries, but lacked the assets to do so. Appellees attempted to alter the priority of the bequest by calling it a tax rather than a gift. The fact that a bequest is a payment of taxes does not change its nature as to the benefi-

ciaries, nor does it elevate the bequest to the level of payment priority granted to taxes owed, as a matter of law, by the estate to the government. Thus, even if Appellees are correct in asserting that the payment of the taxes on the insurance proceeds is governed by the priority of claims statute, because the taxes at issue here were in essence a testamentary gift to the insurance beneficiaries of the amount of the taxes, the bequest should have been prioritized behind creditors and therefore failed. *See* A.R.S. § 14–3805.[12]

¶ 38 Although we may not overrule the trial court's claim priority ruling because Fegen withdrew the appeal of that ruling after being appointed personal representative, the trial court's error is relevant to its assessment of the bad faith issue.[13]

### B. *Bad Faith Finding*

¶ 39 Because we have found that the legal point advocated by the Appellants to have been sound and because the trial court held Appellants to a higher duty than required by law, we vacate the findings of the trial court that Snell & Wilmer acted in bad faith and remand for a new determination on this issue [14] in light of the correct legal standard. In doing so, we note, however, that a party may assert a correct legal position and still have acted in bad faith and, conversely, a party may take an incorrect legal position but have done so in good faith. Because we remand this issue, we need not address Appellee Fegen's cross-appeal: whether Appellants were entitled to any fees in light of the finding that they acted in bad faith.

12. Section 14–3805(A) does not list gifts in its priority scheme because an insolvent estate normally has no assets from which to bestow gifts.

13. Although Fegen withdrew this issue from review, we note that Arizona renders the personal representative liable for legitimate estate debts not paid. *See* Arizona Probate Code Practice Manual § 5.12.4 (early payment of debts is risky because "the PR is liable to the other creditors if the estate turns out to be insolvent"); *cf. In re Warren's Estate,* 74 Ariz. 319, 323, 248 P.2d 873, 876 (1952) (executrix could not be surcharged for payment of creditor's claims properly made wi in statutory period).

14. e facts pertaining to this issue fall on both sic . Possibly the most damaging evidence ag st Appellants was the letter from Sheffield

## CONCLUSION

¶ 40 For the foregoing reasons, we reverse the rulings that Appellants violated Ethical Rules 1.7 and 2.2, affirm the ruling that Appellants violated A.R.S. section 14–3703, and remand the issue of bad faith to the trial court for further proceedings.

CONCURRING: THOMAS C. KLEINSCHMIDT, Presiding Judge and WILLIAM F. GARBARINO, Judge.

to the insurance beneficiaries regarding the appeal from the court's ruling on the insurance proceeds tax issue. In his letter, Sheffield states that "the unsecured creditors have nothing to lose from the appeal at this stage, since the costs of the appeal will not come from their pockets, but rather from the Estate." In addition, nine of the estate's creditors were undisclosed Snell & Wilmer clients, including seven of the twenty-three unsecured creditors of the estate. Nearly half of the debt owed to unsecured creditors was owed to Snell & Wilmer clients. However, two of the insurance beneficiaries, Bank of America and Citibank, were also Snell & Wilmer clients, a fact that may not have been brought to the trial court's attention.